17365

B. H. HOWLE, Appellant, v. EDWARD McDANIEL, Respondent

(101 S. E. (2d) 255)

*Messrs. Yarborough & Parrott,* of Florence, *for Appellant,*

128

*John M. Scott, Esq.,* of Florence, *for Respondent,*

*Messrs. Yarborough & Parrott,* of Florence, *for Appellant, in Reply.*

December 11, 1957.

LEGGE, Justice.

On August 24, 1956, at eleven o'clock at night, a collision occurred on Commander Street in the city of Florence, S. C., between a 1950 Ford automobile, the property of the plaintiff Howle, which was being driven by one Eugene Brown, and a 1942 Chevrolet owned and driven by the defendant McDaniel. Howle sued McDaniel in the Civil Court of Florence for the damage to the Ford; McDaniel pleaded a general denial and contributory negligence and counterclaimed for the damage to the Chevrolet and for his personal injuries alleged to have been sustained as the result of Brown's negligent operation of the Ford.

At the conclusion of all the testimony the trial judge, holding that it was susceptible of no reasonable inference other than that the collision had resulted from the negligence of both drivers, directed a verdict against the plaintiff on the cause of action set forth in the complaint, and against the defendant on that set forth in the counterclaim. Thereafter, plaintiff's motion for judgment *n. o. v.* or, in the alternative, a new trial, was denied.

The plaintiff alone appeals, and by his exceptions charges error on the part of the trial judge in directing a verdict against him.

Mr. Howle, an elderly man, operated a combination grocery store and automobile service station on the Tim-

monsville highway not far from the city of Florence. Eugene Brown, the driver of the Ford, had been in his employ for some five or six years, helping about the store and sometimes delivering merchandise. Brown also worked, occasionally, as a painter, on his own time. As to whether or not, at the time of the accident, Brown was engaged within the scope of his duties as Mr. Howle's employee, there was no testimony other than that of Brown himself and Mr. Howle.

Brown, who lived on Sumter Street in the City of Florence, testified: that he always kept Mr. Howle's Ford car at night, using it to go home after work and to return to work in the morning; that occasionally he used the car to make delivery of groceries; that his work for Mr. Howle consisted of helping with the sale of gasoline, oil and groceries, and running the store when Mr. Howle went home for dinner; that when there was nothing for him to do at the store he would, with Mr. Howle's permission, work as a painter; that on August 24, 1956, he quit work at the store at 7:30 p. m., took the car to his home, and later that evening went, in the car, to visit his uncle, who had been sick; that from his uncle's house he stopped by to see a friend, Joe Rogers, who lived on Wilson Street; and that from Rogers' house he was driving home, alone, when the collision occurred.

Mr. Howle testified as follows:

"Q. (by defendant's counsel) : Well, what was it (the Ford car) used for, Mr. Howle? A. It was mostly used for me to go home and back in and for Eugene to go home in. Eugene was driving me at that time, I wasn't able to drive, he was doing my driving, and that is why he was taking it home with him.

"Q. I see, and he kept it, and it enabled him to get back and from work at his convenience? A. That is right."

And, upon being recalled:

"Q. (by plaintiff's counsel) : For what purpose did Eugene Brown have your automobile on the night of August

24th when this wreck occurred? A. Well, you want me to tell you the reason why?

"Q. Yes, sir. A. Well, at that time and before that time I was sick and Gene stayed with me. Gene stayed with me and I fed him and I let him take my car home and bring it back and pick me up at the house, I gave him breakfast and we went on to the store. If he had a paint job to do I let him have my car to do the paint job.

"Q. Now, for what purpose did you let him have the car at night? A. Just for him to go home and come back and pick me up.

"Q. How far did he live from you? A. Well, I would say approximately a couple of miles.

\* \* \*

"Q. (by defendant's counsel) : Mr. Howle, you said that Brown, Gene Brown, had the right to take the car on home with your permission? A. Yes, sir.

"Q. Now, when he painted, he wasn't doing the painting for you, that was on his own time, wasn't it? A. Yes.

"Q. And he had permission to take the car to paint, if he so desired? In other words, he could do with the car anything he wanted to until he needed it the next morning to bring you to work? A. No, my instructions was for him not to carry it away from the house.

"Q. But he did it, he took it for paint work and other things? A. Yes, with my permission.

"Q. Yes, with your permission. In other words, he had the car at his house and he could go painting or anything else unless you wanted him to take you to work, isn't that right? A. Not at night.

"Q. Did you tell him not to take the car at night? A. Yes.

"Q. Specifically, not to use the car at night? A. Yes.

"Q. In other words, whenever he took the car at night it was without your permission? A. Not to use it but to go home and come back next morning.

"Q. Well what is the difference between using the car for that and going to work to paint with? A. Well, I give him

permission to use it whenever—he always asked me for it and I let him have it.

"Q. In other words, you never have refused to let him use it, whenever he asked you for it, have you? A. Well, I wouldn't say I haven't, I have done it in times past.

"Q. Do you recall any particular time when he asked and you refused to let him have it? A. Yes, I can recall one time—

"Q. What? A. I can recall one time. He wanted to use my car to go to a funeral and I didn't let him have it.

"Q. But you let him take the car home every night? A. Yes, that is right.

"Q. And the car was his to take home? A. With my permission, he had the car to take home."

It is manifest from the foregoing that at the time of the accident Brown was not acting within the scope of his duties as Mr. Howle's employee, but was using the car for his own purposes in nowise connected with such employment. His contributory negligence, if any, could not, therefore, be imputed to Mr. Howle under the doctrine of *respondeat superior. Holder v. Haynes,* 193 S. C. 176, 7 S. E. (2d) 833. But the trial judge, despite his recognition of the absence of master and servant relationship between Howle and Brown at the time of the accident, directed a verdict against Howle upon the theory that Brown's negligence was imputable to him. To quote from his ruling:

"I would be obliged to hold that the only reasonable inference to be drawn from the evidence in this case is that at the time this accident occurred, even if the servant was negligent, he was acting outside the scope of his employment, and so I would be constrained to grant the motion (*i. e.,* plaintiff's motion for a directed verdict as to the counterclaim), but I don't see, gentlemen, that there is any need for me to submit any issue in this case to the jury. It is one of those cases where I am forced to conclude that the only reasonable inference to draw from all of the evidence, on both sides, is that there has been a showing by the plaintiff of

negligence on the part of the operator of the defendant's car, and on the contrary there has been a showing of negligence by the defendant on the part of the operator of the plaintiff's car and that the doctrine of contributory negligence has been established. * * * There was negligence on the part of the operator of the defendant's car and there was negligence on the part of the operator of the plaintiff's car. * * * The negligence that might have been established by the plaintiff against the defendant has been offset by the proof by the defendant of negligence on the part of the plaintiff. Now that means that neither one is entitled to recover any damages against the other."

In the operation of the Ford car at the time of the accident Brown was neither servant nor agent of Mr. Howle. Their relationship was that of bailor and bailee; and Brown's contributory negligence, if any, was therefore not imputable to Howle. 8 C. J. S. Bailments § 40, p. 318, Section 56, p. 373; 60 C. J. S. Motor Vehicles § 439, p. 1108; Am. Jur., Bailments, Section 310, p. 407; 5A Am. Jur., Automobiles and Highway Traffic, Section 635, p. 627. Annotations: 6 A. L. R. 316 *et seq.;* 22 A. L. R. 1246, 1248.

Liability of a bailor for injury to a third person by the bailed property in the possession of the bailee rests, not upon the bailee's negligence, but upon that of the bailor himself. Thus a bailor may be liable to a third person so injured where he has entrusted a dangerous article to one whom he knows to be ignorant of its dangerous quality, or an automobile to one whom he knows to be so reckless or incompetent that danger to third persons would be a reasonably probable consequence of his operation of it. So also may the bailor incur liability if injury to the bailee or another is proximately caused by a dangerous hidden defect in the bailed article, of which the bailee had no knowledge or reason to know, but which was known to the bailor at the time of the bailment. 6 Am. Jur., Bailments, Sections 314, 316, pp. 411, 413. But nothing in the evidence here

warrants inference of liability on the part of the bailor under this rule.

There is no issue before us as to Howle's liability to Mc-Daniel, because the latter did not appeal from the verdict directed against him on his counterclaim. But the same reasoning that imposes liability upon a bailor to a third person injured as the result of his negligence would bar his recovery against such third person for negligently damaging the bailed property, if such negligence of the bailor contributed as a proximate cause of the damage and has been so pleaded by way of defense. In the instant case, however, McDaniel's plea of contributory negligence was directed not to the negligence of Howle, the bailor, but to that of Brown, the bailee, in the operation of the Ford car.

Moreover, apart from the matter of pleading, there was no evidence of such negligence on the part of Howle as would have rendered him liable to McDaniel on the counterclaim, or as would have barred his claim against McDaniel for damage to the Ford. We shall briefly review the evidence as to where and how the accident occurred.

Commander Street, in the block in question, *i. e.,* northward from its intersection or junction with Lucas Street, is straight, narrow and unpaved. McDaniel, as before stated, turned from Lucas and was traveling northward on Commander. It is uncontradicted that the Ford was stationary when it was struck by the McDaniel car at a point some twenty or thirty feet north of a church on Commander Street. It also appears without contradiction that there was a street light burning at the intersection of Lucas and Commander Streets, and another some seventy-five or eighty yards north of the point of collision. There was another light in front of the church, but whether or not it was burning is not clear from the testimony.

McDaniel's account of the collision was as follows:

As he turned his car from Lucas Street into Commander Street he thought he saw a car coming down the street,

"and it seemed like the lights were getting further from me, instead of coming right into my face, and all of a sudden there was an automobile right in front of my face and then is when we had the collision". And:

"Q. The car you ran into, did it have any lights on it? A. I didn't see any lights.

"Q. What side of the street were you on when this happened? A. I was on the right hand side of Commander, going up.

\* \* \*

"Q. (by plaintiff's counsel) : Well, where are the street lights on Commander? A. One is on the corner of Lucas and another one back on up a little further.

"Q. Right up there about—do you know where John Richardson lives? A. No, sir.

"Q. Just tell me this, was there a street light there that night or not? A. I couldn't promise you that.

"Q. Did you see a street light anywhere on Commander Street burning that night? A. There was one on Lucas, on the corner of Lucas where I turned there off of Lucas on Commander.

"Q. And there is another one up there about where the wreck is, isn't there? A. I don't know, sir.

"Q. You just told me there was one a little piece further up. A. That is up further—where that wreck is just about seventy-five or eighty yards up the street further.

"Q. Yes, you know where the wreck happened? A. Yes, sir.

"Q. Is there another street light between there and the one on the corner of Lucas Street? A. If there is one on there I never have paid it any attention.

"Q. You weren't paying it any attention that night—A. Because there was always a light there from that church.

"Q. Was there a light there from that church that night? A. There always be one there.

"Q. Was there one there this night? A. No.

"Q. What? A. No.

"Q. If the street light was burning that night, would you see it? A. That was burning on Lucas.

"Q. How about the one a little further up? A. I never got that far.

\* \* \*

"Q. (by his counsel) : In other words the lights that you saw, which looked like—which direction were they going? A. From the beginning of it it seemed to me like they was vanishing away.

"Q. It was doing what? A. It seemed to me like they was backing up.

"Q. (by plaintiff's counsel) : Ed, those lights you saw backing up from you were car headlights? A. Yes, sir; it seemed to me like they was.

"Q. How far were they from you when you first saw them? A. I couldn't tell exactly how far they was.

"Q. Estimate it for me. A. It was a good deal away.

"Q. You saw them when you turned off Lucas, didn't you? A. It seemed to me like I saw them shortly after I did turn off from Lucas Street, backing up from me.

"Q. There was nothing between you and these headlights you saw? You saw them good and clear? A. I couldn't tell rightly, you know."

James McCullough, the only other occupant of the Chevrolet, testified that McDaniel was driving at about twenty, and not over thirty, miles per hour. And:

"Q. (by defendant's counsel) : Were you looking, which direction were you looking? A. I wasn't exactly looking right straight ahead because I wasn't driving and when I did look back I looked I said 'Ed, look there is a car,' and before I could say that the car just about staggered and all at once the light come on and went off, and that was all I couldn't do nothing myself.

"Q. What side of the street were you on? A. The right hand side—

"Q. And where was this other car in connection with the street, what part of the street was it on? A. It was almost over half way the road, over next the right side.

"Q. You said you saw the lights come on— A. Come on and went right back off, just before it hit.

"Q. In other words the car did not have the light on, at first? A. No, sir."

\* \* \*

"Q. (by plaintiff's counsel) : You saw two of these lights when you claimed they went on, didn't you? A. Yes, sir, I saw them when they come on and went off.

"Q. You knew that they were car lights, didn't you? A. Yes, sir; anybody would know they were car lights."

Eugene Brown testified that the battery in the Ford was an old one, and "weak"; that he had to re-charge it once or twice every week; that after his few minutes' visit with Joe Rogers the car wouldn't start, and Joe had to push it for him to get it started; that when he first saw the McDaniel car it was turning from Lucas Street northward into Commander Street; that he (Brown) was then traveling southward on Commander Street at about fifteen miles per hour, and the headlights on the Ford car were burning; that they were good headlights; that the McDaniel car "wasn't coming straight, it was wiggling across the road"; that he (Brown) pulled off to the right side of the street and stopped, and the Ford was standing still when the McDaniel car struck its left front; and that the left headlight of the Ford was smashed, but the right one was still burning after the collision.

Under this evidence, it seems to us that if Howle were negligent in having a "weak" battery in the Ford, such negligence was too remote to be considered a proximate cause of the accident. Certainly such evidence does not require inference, as a matter of law, that the weakness of the battery rendered the car dangerously defective. And at all events such inference could not lead to the conclusion of liability on the part of Howle, for the con-

dition of the battery was as well, or better, known to Brown than to Howle. In such case the injured third person stands in no better position than the bailee. 6 Am. Jur., Bailments, Section 316, at p. 414.

The trial judge, in his order on the motion for judgment *n. o. v.,* said:

"On the night of the accident, Brown's testimony shows that the accident occurred immediately after the car was started by being pushed off by another car. The crux of the case was whether or not the lights of the plaintiff's automobile were on at the time or cut on immediately prior to the accident. In instances of this nature it is necessary that all of the electricity be channeled into the spark plugs for the car to start more easily and therefore the lights should not be turned on while starting. This was the only reasonable inference from the testimony and I so ruled."

It seems to us at least doubtful that the testimony, to which we have already referred, warranted the factual inference drawn by the trial judge. But if in fact Brown did turn the lights on while the car was being thus started, and his action in so doing was negligent because it made the lights dim, such negligence was that of Brown, not Howle.

Finally, in his order last mentioned, the trial judge held that Brown's negligence as bailee was imputable to Howle because, under our decisions, an automobile is a dangerous instrumentality. We have held that a motor vehicle is a dangerous instrumentality and therefore a proper subject of police regulation, *Heslep v. State Highway Department,* 171 S. C. 186, 171 S. E. 913; *Stovall v. Sawyer, Chief Highway Com'r,* 181 S. C. 379, 187 S. E. 821; and that, for the purposes of prosecutions for involuntary manslaughter, it is, in a sense, a deadly weapon, so that only simple negligence in its operation is sufficient for conviction, *State v. Caldwell,* S. C., 98 S. E. (2d) 259. But it is not, in itself, such a dangerous instrumentality that its loan will overflow the fundamental principles of bailment

hereinbefore discussed. The danger lies not in the vehicle itself, but in its negligent operation.

We conclude, therefore, that the trial judge was in error in holding that the plaintiff was barred of recovery because of contributory negligence of Brown.

We note, again, that a verdict was directed against both parties upon the ground that each was, as a matter of law, contributorily negligent. This ruling was, we think, erroneous as to the complaint, because, as we have seen, the plaintiff was not chargeable with Brown's negligence. In addition, the testimony for the plaintiff, considered alone and taken to be true (as is required in considering direction of a verdict against him, *Wynn v. Rood,* 228 S. C. 577, 91 S. E. (2d) 276; *Howle v. Woods,* S. C., 97 S. E. (2d) 205; *Woods v. Wilhelm,* S. C., 101 S. E. (2d) 252, warranted inference that the collision resulted from the defendant's negligence.

Dismissal of the counterclaim was decision against the defendant's cause of action; it did not adjudge that he was liable on the plaintiff's cause of action. A finding of negligence on the defendant's part is of course implicit in the order directing a verdict against the plaintiff because of Brown's *contributory* negligence; and the fact that the order was erroneous as to the plaintiff does not require that we ignore such implicit finding as to the defendant's negligence. But whether or not, contributory negligence on the part of the plaintiff having been eliminated, the evidence was susceptible of no reasonable inference other than that the accident proximately resulted from negligence on the part of the defendant, is a matter not before us. The plaintiff moved only for direction of a verdict against the defendant on the latter's counterclaim; there was no motion for direction of a verdict in favor of the plaintiff on the cause of action set forth in the complaint. This court may not resolve issues not presented for determination by the trial court. *Simonds v. Simonds,* 229 S. C. 376, 93 S. E. (2d) 107,

The judgment of the lower court is reversed, and the cause is remanded for new trial of the plaintiff's cause of action.

Reversed and remanded.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.