### 17628

SOUTH CAROLINA FINANCE CORPORATION OF ANDERSON, Plaintiff-Respondent, v. WEST SIDE FINANCE COMPANY and J. J. Meredith, Defendants-Appellants.

(113 S. E. (2d) 329)

110

*Messrs. Leatherwood, Walker, Todd & Mann,* of Green-
ville, and *E. Harry Agnew,* of Anderson, *for Appellants,*

*Messrs. J. Bratton Davis,* of Columbia, and *Watkins, Vandiver, Freeman & Kirven,* of Anderson, *for Respondent,*

March 17, 1960.

LEGGE, Justice.

Action to enjoin the alleged breach of a covenant not to compete, and for damages for such breach. Consolidated for trial with it was an action by the defendant Meredith against the plaintiff on a promissory note, to which reference will

be made later. An injunction *pendente lite* was issued and the cause was referred to a special referee to take testimony and report to the circuit court his findings, conclusions and recommendations. Concluding that the covenant was unreasonable, contrary to public policy, and without consideration, and that the plaintiff had come into equity with unclean hands, he recommended that the complaint be dismissed and that judgment be entered against the plaintiff on the promissory note before mentioned. Exceptions to the special referee's conclusions as to these issues were sustained by the Honorable Thomas P. Bussey, Presiding Judge, who by his decree of June 16, 1959, held the covenant valid, enjoined its breach, and found that the plaintiff was entitled, after offset of the amount of the note against its damages, to compensation from the corporate defendant in the amount of $4,281.93, which amount he ordered paid. From this decree both defendants appeal.

The essential facts are not in dispute. For some time prior to March 28, 1958, South Carolina Finance Corporation of Anderson (the corporate name of which, until October 7, 1957, had been Lakemont Finance Company) was engaged in the small loan business with its office at 113 Lakemont Drive, Anderson, South Carolina. On March 28, 1958, it entered into a written agreement with West Side Finance Company, Inc., which was also in the small loan business, having its office at 2103 West Whitner Street in Anderson, whereby it purchased from West Side its furniture, fixtures and office equipment and all of its outstanding small loan accounts receivable as of the close of business on March 25, 1958, and West Side and its officers covenated, among other things, that for a period of three years from March 28, 1958, they would not "engage or be interested directly or indirectly through the medium of any corporation, partnership, association, firm or company, or otherwise, in the business of making personal small loans in Anderson, South Carolina, or within a radius of twenty-five (25) miles of Anderson, South Carolina."

The agreement was executed, on the part of West Side, by J. J. Meredith, its President and sole stockholder. It allocated the purchase price, $23,139.11, as follows:

"(i)   Small Loan Accounts Receivable as of
       the close of business March 25, 1958 . $21,018.09
 (ii)  Furniture, fixtures and office equip-
       ment .................. ..........    621.02
 (iii) Covenants not to compete .... ....  1,500.00
                                          _____

                                          $23,139.11"

Of the purchase price, $2,500.00 was evidenced by a non-negotiable promissory note of the purchaser in that amount, dated March 28, 1958, payable to West Side Finance Company, Inc., sixty days from said date, with interest at the rate of six per cent per annum. This note contained the following provision:

"There shall be deducted from the $2,500.00 any loss sustained or any legal expense incurred by the maker of this note as a result of any breach of any of the warranties or agreements or representations made by West Side Finance Company in an agreement of sale made March 28, 1858."

Upon completion of the transaction of March 28, 1958, South Carolina Finance Corporation moved its office from 113 Lakemont Drive to 2103 West Whitner Street, which it leased from J. J. Meredith, its owner, Meredith's company, West Side Finance Company, having vacated it. About two weeks later, Meredith sold to Mr. Pratt Sosebee all of the stock of West Side Finance Company and the remaining assets of that company, consisting of the office safe, the neon sign, and two notes receivable in the aggregate amount of $1,237.88 which in the course of the settlement on March 28, had, by mutual agreement, been retained by West Side. Thereafter, and prior to the maturity of the $2,500.00 note before mentioned, West Side Finance Company, by Pratt Sosebee as its President, assigned that note to "J. J. Meredith or Order." Within a month after the transaction of

March 28, West Side Finance Company moved into the building at 113 Lakemont Drive, that had been vacated by South Carolina Finance Corporation, and there actively engaged in the small loan business; and it continued to do so until its lending operations were halted by the injunction *pendente lite* issued in this action on September 4, 1958.

The appeal here challenges the adverse ruling by the circuit judge on the issues that had been resolved in favor of the defendants by the special referee, as before mentioned. In addition, it challenges the award of damages as being without proper evidentiary support.

Appellants based their claim to the shelter of the "clean hands" maxim upon: (1) variance, which they contend was undisclosed, between the terms of the agreement of March 28 and those of an option that West Side had given to South Carolina Finance Corporation on March 24; and (2) intellectual and educational superiority of the buyer's representative over Meredith, who was illiterate. The option, to expire April 1, 1958, gave. to South Carolina Finance Corporation the right to purchase: (1) all of West Side's accounts receivable (less the two notes before mentioned, aggregating $1,237.88) as of the close of business March 24, at their face value; and (2) all of West Side's office equipment (except the safe) at "remaining cost" as shown on the depreciation schedule in West Side's 1957 income tax return. It further provided that in the event of its being exercised: (1) the seller would pay all outstanding current obligations; (2) Meredith, as sole stockholder, would transfer all of the West Side stock to the buyer; and (3) the buyer would "pay J. J. Meredith personally one thousand five hundred and no/100 ($1,500.00) dollars, in consideration that he will not compete in his name or in any capacity in the small loan business in Anderson County, South Carolina, for the next three years from this date." It further provided that it was expressly contingent upon the buyer's agreeing to take a lease of the premises then occupied by the seller, for a term of one year

at a rental of $50.00 per month, with option to renew for four additional years at a rental of $60.00 per month, the seller agreeing to make certain improvements to said premises.

That the transaction as consummated was not identical with that proposed in the option affords, of itself, no basis for application of the "clean hands" maxim; establishment of appellants' claim required proof of unconscionable over-reaching on the part of respondent in the transaction. But we note, in passing, the differences in the transaction as proposed in the option and that consummated by the "agreement of sale", as follows:

1. The option contemplated the transfer by Meredith to the purchaser of all of the capital stock of West Side; whereas in the sale as consummated Meredith retained this stock.

2. The option contemplated a covenant on the part of Meredith personally not to compete in Anderson County; the agreement of sale contained a covenant on the part of West Side and its officers (the record reveals none other than Meredith) not to compete within a radius of twenty-five miles of the City of Anderson.

The following observations seem pertinent:

1. West Side's license, which was to expire on December 31, 1958, was not mentioned in either instrument. It was, by the express provisions of Section 8-794.41 of the Code, non-assignable.

2. The price to be paid by the buyer was substantially the same under the agreement of sale as under the option, to wit: all accounts (small loan notes) receivable (excepting the same two), as of the close of business March 24 (option) or March 25 (agreement of sale), at face; office equipment (except safe) at depreciated value; and $1,-500.00 for covenants not to compete.

3. Had Meredith transferred his stock to the buyer, as was contemplated in the option, West Side would have become a wholly owned subsidiary of the buyer; its future

operations, if any, would have been completely subject to the buyer's control; and consequently there was no reason to provide, in the option, for a covenant on the part of West Side not to compete.

4. It can hardly be said that Meredith's position was worse under the agreement of sale as consummated than it would have been had the option been exercised. In either case, he, personally would have covenanted not to compete for three years. The area of the covenant was larger under the agreement of sale than that provided for in the option. But under the agreement of sale as consummated Meredith still had the stock of West Side, and he and that company would be free of the covenant after three years; whereas under the terms of the option West Side could never have re-entered the small loan business as an independent entity, without the buyer's consent.

Throughout the transaction respondent was represented by its treasurer, Mr. Robert R. Hudson, a well-educated certified public accountant. He testified that when he went to the offce of West Side on March 28 he took with him the option of March 24 and the agreement of sale that he had had prepared and that was later executed; that he had not previously discussed it with Mr. Meredith, but that when they met to close the deal he stated to Mr. Meredith that his company was not interested in purchasing West Side's stock or license because the Board of Bank Control had advised him that if the assets of West Side were consolidated with those of South Carolina Finance Corporation West Side's license would have to be surrendered. The record shows Mr. Meredith as a man forty-six years of age who cannot read and can write only his name. No impairment of health or mental faculties is suggested. His testimony reveals him as a successful businessman, owning, in addition to his small loan company, a used car business and considerable real estate, both residential and commercial. His son, a graduate of Clemson College, attended the closing of the transaction here in issue, went over the written agreement

of sale and the note, and read them to his father, who thereupon signed the agreement of sale and accepted the note as part of the settlement. Mr. Meredith's son signed as a witness to the agreement. We have fully considered all of the evidence, and concur in the finding by the circuit judge that there was no overreaching, and that there is no merit in appellants' contention that respondent's claim should be rejected under the "clean hands" doctrine. It is suggested in argument that respondent has no standing in equity because South Carolina documentary stamps were not affixed to the $2,500.00 note before mentioned. But that contention was not made in the trial court, and is therefore not available here. *Simonds v. Simonds*, 229 S. C. 376, 93 S. E. (2d) 107; *Howle v. McDaniel*, 232 S. C. 125, 101 S. E. (2d) 255; *Edwards v. Great American Ins. Co.*, 234 S. C. 404, 108 S. E. (2d) 582.

We come, then, to consideration of the exceptions that charge that the covenant not to compete is: (1) contrary to public policy; and (2) unreasonable in its scope. At the time of the transaction under review there were twenty-seven small loan companies operating in "Greater Anderson", all located in the downtown area with the exception of the two corporate parties to this cause. West Side's office, at 2103 West Whitner Street, was about two miles west of the center of the city; South Carolina Finance Corporation's, at 113 Lakemont Drive, was about half a mile closer in. All of the twenty-seven held licenses granted under the "grandfather clause" (Section 4 (c) of the Small Loan Law of 1957 (50 Stat. at L. p. 339)) which provided for the issuance of licenses to small loan companies already licensed under former provisions of law. We need not speculate whether the fact that no new licenses had been issued under the 1957 Act resulted from lack of applicants or from determination by the Board of Bank Control that the needs of the community in the small loan field were fully served by the numerous lenders automatically licensed as aforesaid. The conclusion for which appellants.

contend, *i. e.,* that enforcement of the covenant would be detrimental to the interests of the community and therefore contrary to public policy, is not warranted by the mere fact that elimination of West Side for three years would reduce the number of small loan companies in the Greater Anderson area from twenty-seven to twenty-six and would leave respondent the only such company having its place of business on the western outskirts of the city proper. No other basis for such conclusion is suggested. As the circuit judge points out in his decree, if during the period of the covenant it should be made to appear to the Board of Bank Control that the "convenience and advantage of the community" would be promoted by the issuance of additional licenses, the Board would have power to issue them.

A covenant not to compete is enforceable if it is not detrimental to the public interest, is ancillary to the sale of a business or profession, is reasonably limited as to time and territory, and is supported by a valuable consideration. 36 Am. Jur., Monopolies, Combinations, and Restraints of Trade, Sections 52, 53, 54, 55, 56; *Metts v. Wenburg,* 158 S. C. 411, 155 S. E. 734; *Reeves v. Sargeant,* 200 S. C. 494, 21 S. E. (2d) 184; *Somerset v. Reyner,* 233 S. C. 324, 104 S. E. (2d) 344.

The covenant here was clearly supported by valuable consideration. In addition to the specific allocation of $1,500.00 of the purchase price to the covenant, the agreement of sale states: "It is expressly provided that the seller's and its officers' covenants not to compete, contained in Section 3 hereof, are a material provision of this agreement, that the buyer has paid a valid consideration therefor, and that said covenants shall survive the closing under this agreement." We see no merit in appellants' suggestion that since respondent did not pay the $2,500.00 note the covenant not to compete was without consideration. In the first place, that note, which was accepted as part of the purchase price, was by its express terms subject to offset by the amount of any loss sustained or legal expense incurred by the purchaser

as the result of any breach by the seller of any of its agreements contained in the agreement of sale. In the second place, the circuit judge found as a fact, and properly so, we think, that respondent's loss and legal expenses resulting from the breach of the covenant exceeded the amount of the note, and that Meredith, as its assignee, was entitled to nothing.

Appellants contend that the covenant was not ancillary to the sale of the business or its good will because the sale did not include the two notes aggregating $1,237.88, the office safe, the neon sign, or West Side's license. Each of the two notes just mentioned was in an amount larger than $200.00, and they were thus not appropriate to the business of a "small loan company" as defined in the Small Loan Law of 1957. The neon sign was obviously not wanted by a purchaser that was not going to use the seller's name. The license, as before stated, was non-assignable. It is clear from the evidence, and as a matter of common sense, that the purpose of the acquisition by the purchaser of all of the seller's outstanding small loan accounts (for which full face value was paid) was not simply to liquidate them, but rather, by personal contact with those customers and satisfactory handling of their current business, to ensure their return whenever they should need, or want, to borrow again. We agree with the circuit judge that realistically the sale was intended to, and did, include the "small loan business of the seller." That "good will" was not mentioned by name does not persuade us to a contrary view.

There is nothing in the record to suggest that the covenant was unreasonable in duration. Appellants do not argue that it was; but they contend that its territorial extent was greater than reasonably necessary for the protection of the respondent. The sales agreement contained a list of two hundred forty-nine small loan accounts receivable, showing the names of the borrowers and the unpaid balances of the loans, totalling $21,018.09. This list did not set out the borrower's addresses; but the testimony

showed and the circuit judge found as a fact that while the majority of the borrowers lived in the highly industrialized western part of the Greater Anderson area, there were some throughout Anderson County, some lived within a radius of twenty-five miles of the City of Anderson at such places as Clemson and Seneca in Oconee County, Central, in Pickens County, and Hartwell in the State of Georgia, and still others lived in Westminster in Oconee County and Greenwood in Greenwood County, beyond the twenty-five mile radius. We agree with his conclusion that in territorial extent the covenant was reasonable.

The award of damages by the trial judge amounted to $6,781.93, as follows:

Legal expenses of respondent incurred as the
result of the breach of covenant . . . . . . . .$2,281.93
Approximated loss of profits sustained by re-
spondent during the four months' period,
April 26-August 26, 1958 . . . . . . . . . . . . 4,500.00

$6,781.93

Against this he offset respondent's note for $2,500.00 and accordingly ordered West Side to pay to the respondent $4,281.93.

Appellants challenge both parts of the award, contending that the item of $2,281.93 is not a proper element of damage and that the item of $4,500.00 is based upon speculation and conjecture.

That respondent's obligation for counsel fees and other legal expenses in connection with the breach of the covenant amounted to $2,281.93 is not questioned, nor is that figure attacked as unreasonable. Appellants contend that this item is, as a matter of law, not recoverable; and they cite *United States Rubber Co. v. White Tire Co.,* 231 S. C. 84, 97 S. E. (2d) 403. But that case does not sustain their position. We held there that a fee paid by a lessor to her attorney was not chargeable against a deposit made by

the lessee as security for its performance of its obligations under the lease, for the reason that the contract between the parties did not so provide. Here the note for $2,500.00 expressly provided that respondent should have the right to deduct from its obligation thereunder the amount of "any loss sustained or any legal expense incurred" by it "as a result of any breach of any of the warranties or agreements or representations" made by West Side in the agreement of sale. Appellants would restrict this security to losses that the purchaser might sustain or legal expense that it might incur because of any invalid or forged notes among those purchased. But the broad and unambiguous language quoted above warrents no such narrow construction. In our opinion the circuit judge correctly construed it as covering any breach by West Side of any of its obligations under the agreement of March 28, 1958, including its covenant not to compete.

The measure of damages for breach of contract is the loss actually suffered by the contractee as the result of the breach. 15 Am. Jur., Damages, Section 43. And profits that have been prevented or lost as the natural consequence of a breach of contract are recoverable as an item of damages in an action for such breach. 15 Am. Jur., Damages, Section 149; *Charles v. Texas Co.*, 199 S. C. 156, 18 S. E. (2d) 719. To warrant such recovery, loss of profits must be established with reasonable certainty, for recovery cannot be had for profits that are conjectural or speculative. "But it must be borne in mind that since profits are prospective they must, to some extent, be uncertain and problematical, and so, on that account or on account of the difficulties in the way of proof, a person complaining of breach of contract cannot be deprived of all remedy, and uncertainty merely as to the amount of profits that would have been made does not prevent a recovery. The law does not require absolute certainty of data upon which lost profits are to be estimated, but all that is required is such reasonable certainty that damages may not be based wholly upon spec-

ulation and conjecture, and it is sufficient if there is a certain standard or fixed method by which profits sought to be recovered may be estimated and determined with a fair degree of accuracy." 15 Am. Jur., Damages, Section 150; *Lester v. Fox Film Corp.*, 114 S. C. 533, 104 S. E. 178; *Charles v. Texas Co., supra.*

The rule allowing recovery of lost profits is applicable ██ ██ in actions for breach of covenant not to compete: to the extent that they are shown to have been the natural result of the breach, such profits are a proper element of damage; to the extent that they exist only in the realm of speculation or conjecture, they are not recoverable. From the nature of things it is impossible, in an action for breach of such a covenant, to determine with mathematical precision the amount of the plaintiff's damage. The rule must be applied in the light of the facts and circumstances of the individual case. The difficulties that the courts have experienced in its application are evident in the numerous cases mentioned in the annotation in 127 A. L. R. at pages 1152 *et seq.*

In the case at bar the respondent procured through sub-poena West Side's loan register in which were recorded all loans made by it during the period April 26-August 26, 1958. It showed that during that period West Side had made two hundred eighty-five (285) loans, aggregating in face amount $28,407.50. Of these, one hundred eighty-two (182), aggregating in face amount $19,346.00, were to borrowers whose earlier accounts had been sold by West Side to the respondent or who were otherwise respondent's customers. Of the remaining one hundred three (103) the great majority were to borrowers in the neighborhood of respondent's place of business in the western area of Greater Anderson. Respondent's treasurer, Mr. Hudson, testified that had the respondent made all of the said 285 loans its gross profit therefrom, based on the amounts permitted under the Small Loan Law to be collected from the borrowers and retained, over and above the cash advance, would have been

$6,519.52; and its net profit after the additional expense incident to the making and collection of those loans, and before State or Federal income taxes, would have amounted to $5,834.90. By like calculation, he testified that respondent's gross profit on the 182 loans aggregating $19,346.00, made by West Side to borrowers whose accounts respondent had purchased or who were otherwise respondent's customers, would have amounted to $4,439.91, and its net profit to $3,973.67.

In addition to the foregoing, there was testimony for the respondent suggesting loss of good will resulting from confusion of its customers. (It appears that when West Side re-entered the small loan business on April 26, 1958, occupying the office at 113 Lakemont Drive that respondent had vacated, it announced by advertisements in the daily newspapers and in several hundred letters soliciting the business of prospective borrowers throughout the area, including those whose accounts it had sold to respondent, that it had been "formerly Lakemont Finance Company", which in fact it never had been, that having been respondent's former name. It further appeared, uncontradicted, that in nine instances where West Side made loans, after April 26, to respondent's customers, their outstanding loans from respondent had been paid off, in advance of their due dates, by checks of West Side.) There was also testimony to the effect that West Side's breach of the covenant caused respondent to lose time of its executives valued at "several hundred dollars" and to incur expenses of travel amounting to $186.10 and of telephone calls amounting to approximately $100.00.

Judge Bussey, suggesting that the amount of respondent's other losses resulting from the breach of covenant could not be determined with reasonable accuracy, confined himself, in his determination of the award of damages, to the legal expenses and loss of net profits before referred to. He pointed out the impossibility of saying with absolute certainty that all of the two hundred eighty-five loans made by

West Side between April 26 and August 26, 1958, would have been made by the respondent even if West Side had not opened its office in the neighborhood. And he noted also that it could not be said with certainty that had these loans been made by respondent they would all have been repaid in full, on time, and without collection expenses or losses. Taking these things into consideration, he rejected the figure $5,834.90 and concluded instead that $4,500.00 was a fair approximation of the amount of net profits lost by respondent as the result of West Side's breach of the covenant during the said four months' period.

We do not agree with appellants' contention that the testimony before mentioned concerning respondent's claim for loss of profits was so speculative and conjectural as to require its rejection. In the circumstances of the instant case we can think of no more direct approach to the issue of damages. Nor do we find error on the part of the circuit judge in setting the amount allowed for loss of profits at $4,500.00 rather than $5,834.90. The rule to which we have referred recognizes the practical impossibility of exact calculation of such profits and requires only a fair and reasonable approximation of them from all of the facts, circumstances and data disclosed by the evidence.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and Moss, JJ., concur.