0660

George PETTY, d/b/a Petty's Skate Arena, Respondent v. WEYER-
HAEUSER COMPANY and Burris Construction Company, Inc., Defen-
dants, of whom Weyerhaeuser Company is Appellant.

(342 S. E. (2d) 611)

Court of Appeals

*Manton M. Grier, Walter W. Theus, Jr.,* and *Clarke W. DuBose,* Columbia, *for appellant.*

*Martin S. Driggers,* and *Edward E. Saleeby* of *Saleeby, Cox & Bledsoe, P.A.,* Hartsville, *for respondent.*

Heard Jan. 28, 1986.

Decided March 24, 1986.

CURETON, Judge:

Appellant Weyerhaeuser Company (Weyerhaeuser) appeals an order of the trial court that refused to allow it to serve a late answer. It also appeals a second order of the trial court that awarded damages of $123,092.02 for defective building materials sold by Weyerhaeuser to Petty. We affirm.

Petty opened a new skating rink in the town of Hartsville, South Carolina on September 20, 1974. After four to six weeks, the particle board floor supplied by Weyerhaeuser started to buckle making it unsuitable for skating. Eventually, the floor required replacement. Petty testified at trial that he opened the rink to overflowing crowds but after

the floor deteriorated, customers complained and the crowds shrank. Following the replacement of the floor in July 1975 the rink reopened and business slowly improved, but never to the level he enjoyed during the first three months of operations in 1974. Petty also testified that his operating expenses were "fixed" and were incurred whether or not he operated the business to capacity.

Petty filed suit in February 1976 seeking damages from Weyerhaeuser and a co-defendant Burris Construction Company on the theories of negligence, breach of warranty and strict liability.[1] Petty attempted to serve Weyerhaeuser by service upon the Secretary of State of South Carolina. The Secretary in turn mailed the summons and complaint to C.T. Corporation System in Greenville, South Carolina. C.T. Corporation System was not the registered agent of Weyerhaeuser but, nevertheless, forwarded the suit papers to Weyerhaeuser at its corporate offices in Tacoma, Washington.

Upon receiving the suit papers, Weyerhaeuser 's counsel telephoned Petty's attorney on February 27, 1976 and obtained an indefinite extension of time to respond to the pleadings and to enable him to explore settlement possibilities. Thereafter, Petty's counsel wrote to Weyerhaeuser's counsel with an offer of settlement but received no response to the offer. Ultimately, on August 9, 1976 Petty's lawyer wrote to Weyerhaeuser's counsel advising him of an upcoming term of court and requesting a response "so that we will know whether to demand an answer and start our discovery in this case." The letter ended: "Please let us have some response from you concerning whether you will meet our settlement demand or send us your answer to our complaint within ten (10) days of the date of this letter."

When no response or answer was received from Weyerhaeuser, Petty moved on August 20, 1976 for a default judgment and an order of reference. An order of default was entered and the matter was referred to a referee who, after holding a hearing, recommended entry of a judgment for Petty. The circuit court entered judgment on the recommen-

---

[1] The record does not reflect the resolution of the claims against the defendant Burris Construction Company.

dation. Weyerhaeuser then moved to set aside the judgment based on improper service. Its motion was denied. In an appeal to the South Carolina Supreme Court, the case was remanded for a determination of whether the judgment should be set aside because Petty's counsel failed to give Weyerhaeuser notice of its motion to declare Weyerhaeuser in default.

Pursuant to the remand from the Supreme Court, Judge Chandler held a hearing and at its conclusion, ruled that the default judgment would be set aside, but reserved for Petty the right to move for an order of default after proper notice to Weyerhaeuser. Thereafter, Weyerhaeuser removed the case to the federal District Court of South Carolina. The district court found that the case had been improvidently removed and remanded it to state court. Petty again moved for a default judgment and an order of reference. Weyerhaeuser also moved for an order holding that it was not in default, or for permission to file a late answer. Judge Chandler held Weyerhaeuser in default, refused it permission to file a late answer, and again, referred the matter to a special referee to assess damages. The referee found Petty entitled to damages of $123,092.02. This sum represents $18,870.52 to replace the floor, $4,221.50 to compensate Petty for time lost in repairing and replacing the floor and $100,000.00 for damage to the business. In an appeal to the circuit court, the referee's findings and recommendations were confirmed in their entirety. Weyerhaeuser appeals only the $100,000.00 award for damage to the business.

Weyerhaeuser submits fifty-five exceptions alleging error on the part of the circuit judge. These exceptions have been restated in three questions in Weyerhaeuser's brief:

(1) Did the lower court err in ruling that Weyerhaeuser is in default, and that such default was not a result of excusable neglect?

(2) Are lost profits recoverable under the "new business rule" for a new business with only three months operating history, in that such lost profits are merely speculative and too uncertain to be recoverable?

(3) Did the lower court err in the methods it used to determine damage to Plaintiff's business?

## I.

Pertaining to the issue of default, a motion to be relieved of default is addressed to the discretion of the trial judge. *See Em-Co Metal Products, Inc. v. The Great Atlantic & Pacific Tea Co.*, 280 S. C. 107, 109, 311 S. E. (2d) 83, 85 (Ct. App. 1984). Weyerhaeuser argues that the letter demanding an answer is ambiguous and did not provide him notice that an answer was being demanded by a specific date. The trial court found that the letter was specific enough in "setting a date by which [Weyerhaeuser] would be required to answer." This finding has evidentiary support. We find no abuse of discretion.

Weyerhaeuser also argues that the parties, through their exchange of letters, created a contractual agreement that in effect afforded Weyerhaeuser an indefinite extension of time to answer and that Petty's demand letter was ineffective to terminate that contract. Weyerhaeuser cites the Pennsylvania case of *Hahnemann Medical College & Hospital v. Hubbard*, 276 Pa.Super. 436, 406 A.(2d) 1120 (1979) as authority for its argument. The *Hubbard* court applied principles of contract law in deciding that there had been no agreement between attorneys about an extension of time to answer. The trial judge in addressing this argument said:

> This appears to be an attempt at a new theory of law; current South Carolina law construes an extension of time granted by the Plaintiff to be a courtesy.

Counsel for Weyerhaeuser has not brought to our attention any other case that has construed an extension in the fashion suggested. We decline to adopt at this time any theory that would construe an extension of time to answer as anything other than a courtesy from the granting attorney.

Lastly, citing *Wright v. Central States, Southeast & Southwest Areas, Health & Welfare Fund*, 440 F. Supp. 1235 (D. S. C. 1977), Weyerhaeuser argues that under the provisions of the Federal Rules of Civil Procedure 81(c) his answer, filed after the case had been removed to the federal district court, was valid. Rule 81(c) provides *inter alia;* "In a removed action in which the defendant has not answered, he shall answer ... within five days

after the filing of the petition for removal. . . ." We hold that Rule 81(c) does not protect Weyerhaeuser. Here, a default judgment was entered prior to the time the case was removed to the federal court. While it is true, removed actions are governed procedurally by the Federal Rules of Civil Procedure, substantively judgments of state courts remain in force unless vacated by the federal court. *Colonial Bank & Trust Co. v. Cahill*, 424 F. Supp. 1200 (N.D.Ill. 1976). No order was entered in this case setting aside the default. Thus, the default remained in full force and effect as if the case had not been improvidently removed.

## II.

We next address Weyerhaeuser's claim that the trial court's award of $100,000.00 as damage to Petty's business is error. During the period covered by the damages award, Petty had gross revenues as follows: 1974 — $27,727.97; 1975 — $69,810.39; 1976 — $81,653.64; 1977 — $87,509.85. In awarding damages to the business, the referee found that based on the historical earnings data for 1974, Petty could have reasonably expected to have had gross revenues of $100,000.00 in 1975 if he had not incurred problems with the floor. He further concluded that since Petty experienced a 17% increase of gross revenues in 1976 over his 1975 revenues, that without the defective floor, his gross revenues should have been $115,000.00. Likewise, the referee found that since Petty realized a 7% increase of revenues in 1977 over 1976 revenues that Petty's gross revenues in 1977 should have been $123,050.00. He then concluded that Petty had a loss of gross revenues in 1975 of $30,189.61; 1976 of $33,346.36 and 1977 of $35,540.15.[2] The referee then concluded "that a fair, proper and reasonable admeasurement of the damage to the Plaintiff's business, including loss of revenues, loss of profits, damage to reputation and damage to good will is the sum of $100,000.00."

.

---

[2] In the referee's report, the referee compared the projected revenues for Petty's Skate Arena to those of another arena in a nearby town. He determined that the businesses were comparable and partially based his decision concerning the growth rate of revenues for Petty's arena on data from the other arena.

We first note that the instant action involves only law
issues. In an action at law tried by a judge with a
reference to a referee, the trial judge's findings will
be afforded the same effect as a jury's verdict. *Townes
Associates, Ltd. v. City of Greenville,* 266 S. C. 81, 86, 221
S. E. (2d) 773, 775 (1976). Where, as here, there is a general
verdict involving two or more causes of action, we will not
reverse the verdict if the evidence supports at least one of
the causes of action. *See Anderson v. West,* 270 S. C. 184, 188,
241 S. E. (2d) 551, 553 (1978); *Gold Kist, Inc. v. Citizens &
Southern National Bank,* 286 S. C. 272, 333 S. E. (2d) 67, 73
(Ct. App. 1985).

Ordinarily, when prospective profits are prevented by the
tortious conduct of the defendant, the plaintiff may recover
such profits when he can prove that (1) it is reasonably
certain that such profits would have been realized except for
the tort; and (2) such lost profits can be ascertained and
measured from the evidence produced with reasonable cer-
tainty. By certainty it is meant that the damages may not be
left to mere speculation or conjecture. 22 Am. Jur. (2d)
*Damages* Section 177 (1965). *See South Carolina Finance
Corp. v. West Side Finance Co.,* 236 S. C. 109, 123, 113 S. E.
(2d) 329, 336 (1960). "The law does not require absolute
certainty of data upon which lost profits are to be *estimated,*
but all that is required is such reasonable certainty that
damages may not be based wholly upon speculation and
conjecture, and it is sufficient if there is a certain standard
or fixed method by which profits sought to be recovered may
be estimated and determined with a fair degree of ac-
curacy." *Id.* at 122-123, 113 S. E. (2d) at 336 (emphasis
added).

Weyerhaeuser does not contend that Petty has not
suffered some damages. Its argument is that the
three month period the business operated in 1974
prior to encountering the debilitating effect of the defective
floor does not afford a reasonable basis for calculating lost
profits. We reject this argument. The problematic nature of
proving damages for loss of profits in a tort action will not
prevent recovery where, as here, the plaintiff can present
evidence from which the court can make "fair and reason-
able approximation of them." *South Carolina Finance Corp.*

236 S. C. at 125, 113 S. E. (2d) at 337. *See* 4 Restatement of Torts 2d Section 912 (1979); 22 Am. Jur. 2d *Damages* Section 177 (1965) ("Where the wrongful act of the defendant is of such a nature as to prevent determination of the exact amount of damages, the defendant is not allowed to insist on absolute certainty, but only that the evidence show the lost profits by reasonable inference."). We hold that the three month period provides sufficient historical data to support an award for loss of profits.

Weyerhaeuser next asserts the referee and trial court used improper methods in calculating damages to the business. Specifically, it contends that the referee and trial judge used gross revenues and not net profits to calculate damages. We note first that the award covers damage to Petty's reputation, loss of profits from the business and loss of good will of the business. Nowhere in the record is there a breakdown of what portion of the award is for each. Weyerhaeuser argues that we need only add up the referee's figures concerning the loss of gross revenues to arrive at the figure of $99,076.12, and by subtracting this figure from the award of $100,000.00, we arrive at a loss of good will of approximately $1,000.00. We do not agree. The referee's report makes it clear that the loss of gross revenues is only indicative of the extent of the damage to Petty's business. The referee stated:

> The analysis of Plaintiff's losses in gross revenues for his first three years demonstrates the business losses sustained by the Plaintiff, but does not conclusively prove the full extent of the Plaintiff's business damages. It does, however, clearly indicate the serious impact of the Defendant Weyerhaeuser Corporation's wrongful conduct upon Plaintiff's business.

If the trial court had awarded only loss of profits, the trial court's method of calculating damages would have to clearly reflect that the award was for net profits only.[3] *See South Carolina Finance Corp.*, 236 S. C. at 124-25, 113 S. E. (2d) at 337. Ordinarily, in computing the amount of lost profits

---

[3] "Net profits" is defined as the gross revenues less operating costs. 22 Am. Jur. (2d) *Damages* Section 178 (1965).

whether in a tort or contract action, the expenses saved must be subtracted from any recovery; that is, the plaintiff is entitled to net profits rather than expected gross profits. 22 Am. Jur. (2d) *Damages* Section 178 (1965). However, where a plaintiff seeks damages to his business and reputation it is not error for the court to utilize gross revenues to estimate damages, where as here, there is evidence that the operating costs can not reasonably be reduced by the plaintiff following the defendant's wrongful act. 3 A. L. R. (3d) 689, 698 (1965); 22 Am. Jur. (2d) *Damages* Section 178 (1965).

Weyerhaeuser next asserts that the trial court awarded Petty a double recovery when it awarded him damages for injury to good will and reputation in addition to lost gross revenues. This argument is without merit in view of our prior holding that there is simply no way to tell what sums, if any, were awarded for each of these items.

### III.

Finally, Weyerhaeuser claims that the trial court awarded damages not prayed for in the complaint. It interprets the complaint to request damages only through the date of the complaint. We see no merit to this argument. While the language of the complaint is couched in terms of damages having been "suffered" by Petty, we think it clear the complaint seeks recovery for all damages suffered by Petty resulting from the wrongful acts of Weyerhaeuser. Moreover, judicial economy would require that Petty recover all his damages in one action.

Affirmed.

SHAW and GOOLSBY, JJ., concur.