**GENERAL SPRINKLER CORPORATION, Plaintiff,**

v.

**LORIS INDUSTRIAL DEVELOPERS, INC., Defendant.**

**Civ. A. No. 8671.**

United States District Court
D. South Carolina,
Florence Division.

Aug. 1, 1967.

---

Samuels S. Williams, Herbert, James & Williams, Charlotte, N. C., Arthur A. Holler, Holler & Holler, Myrtle Beach, S. C., for plaintiff.

John M. Scott, Wright, Scott, Blackwell & Powers, Florence, S. C., S. Watson Dawes, Dawes & Dawes, Loris, S. C., for defendant.

## ORDER

SIMONS, District Judge.

This action was instituted by plaintiff against defendant by the filing of its complaint on April 24, 1965 seeking damages in the sum of $15,000 for an alleged breach of contract signed by the parties

on September 13, 1963 [1] at Loris, South Carolina. In its answer defendant pleaded a general denial and as a second defense alleged that plaintiff was unable to comply with the terms and conditions of the contract with particular reference to the issuance of an insurance policy covering defendant's building and contents by Associated Factory Mutual Fire Insurance Company, and that because of such failure on plaintiff's part defendant on or about November 21, 1963 notified plaintiff it was rescinding said contract. Defendant prays that plaintiff's complaint be dismissed with costs.

The cause came on for trial before the court without a jury at the April 1967 term of this court. In accordance with Rule 52(a) of Federal Rules of Civil Procedure the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1) Plaintiff, a North Carolina corporation with its principal offices at Charlotte, North Carolina, is engaged in the business of installing automatic sprinkler systems and is duly authorized to do business in this state.

2) Defendant, a South Carolina corporation with its principal office at Loris, in Horry County, South Carolina, was organized by the people of its community for the purpose of attracting industries to locate there by constructing suitable facilities for interested industries.

3) Some time prior to April 1, 1963 defendant contracted for the construction of an industrial building at Loris, South Carolina, for Adams Engineering Company of Miami, Florida, with J. S. Singletary Company of Clarkton, North Carolina, as general contractor, for a total cost of approximately $460,000.00. Defendant signed a lease agreement with its prospective tenant, Adams Engineering Company, or one of its subsidiary corporations acting through its president Silvers, and a Small Business Administration loan with participation by Farmers Bank of Loris was obtained.

4) Defendant determined to install an automatic sprinkler system in the building which was in addition to the work required under the general contract. The general contractor accepted competitive bids for such installation and plaintiff's bid being the low one was referred by the general contractor to defendant. Thereafter plaintiff and defendant entered into a written contract at Loris, South Carolina on or about September 13, 1963 (see note 1 above), whereby plaintiff agreed to design, fabricate and install an automatic sprinkler system in defendant's building then under construction for a total contract price of $40,000. The contract was prepared by plaintiff and its original draft was amended in certain particulars at the suggestion of defendant. The following special clause or condition was inserted in the contract at defendant's request to meet one of its tenant's requirements:

> "This entire contract is conditioned upon the inspection, acceptance, approval and the issuance of an insurance policy covering the building and contents by Associated Factory Mutual Fire Insurance Company."

The contract contained no time limit for performance by plaintiff; thus time was not of the essence of the agreement.

Prior to entering into the contract with defendant plaintiff's president and other representatives made several trips from Charlotte to Loris to confer with defendant's officials and to Clarkton, North Carolina to confer with defendant's general contractor. Plaintiff had also done a considerable amount of preliminary engineering work and had drafted preliminary plans.

1. There is some confusion in the record as to the precise date of the execution of the contract. A duplicate original introduced in evidence as plaintiff's exhibit 1 shows that the contract was executed in Loris, S. C., on September 13, 1963, and was accepted on that same date by plaintiff's president in Charlotte. Other duplicate originals of the contract indicated that it was accepted on September 17, 1963 in Charlotte, North Carolina. Such discrepancy is immaterial.

5) After the execution of the contract, plaintiff completed its working drawings and plans for the installation of the sprinkler system and on September 23, 1963 obtained approval of same by the Engineering Division of Associated Factory Mutual Fire Insurance Companies as required by the contract. Plaintiff also endeavored to obtain a hazard insurance policy over defendant's building and contents from one of the affiliated Associated Factory Mutual Fire Insurance Companies, as required by the special condition of the contract above set forth.

6) Associated Factory Mutual Insurance Companies has seven affiliated members, one of which is Blackstone Mutual Insurance Company of Providence, Rhode Island. Obtaining the requisite insurance in any one of the seven affiliated companies of the Associated Factory Mutual group would satisfy the special condition of the contract.

7) Construction of defendant's building had been commenced by the general contractor in April 1963 and was nearing completion the latter part of September or early October. During construction defendant was covered by a builders' risk policy issued by the Insurance Company of North America, defendant's exhibit "E". Defendant's tenant started moving its equipment into the building in late September and paid its first rental payment in October 1963. In order for the builders' risk policy to remain in effect after the building was completed and occupied the insurance company required the payment of additional premium and its approval of the tenant. The evidence indicates that the builders' risk insurance company wanted to get off of the risk because it was not satisfied with defendant's tenant.

8) During this time plaintiff's president Walden attempted to obtain fire insurance for the building and contents with Associated Factory Mutual Fire Insurance Company as required by the special contract condition. Because of a previous experience in Florida with defendant's tenant who allegedly was thought to have intentionally burned a building there, this Company refused to write the coverage. Walden continued in his efforts to obtain acceptable insurance. Thereupon about the first of November 1963 plaintiff's president telephoned defendant's president Prince advising of his failure to obtain the required coverage with the Associated Factory Mutual. He advised Mr. Prince of his continued efforts to get insurance, that he had been to Charleston, South Carolina, to contact a representative of the Improved Risk Mutual Insurance Company which was writing much of the fire insurance coverage over buildings owned by the State of South Carolina; that this Company had approved his plans and he was advised that it was willing to write the coverage for defendant. He requested Mr. Prince to have his local insurance agent contact the company's Charleston representative about the coverage. Mr. Prince agreed to contact his local insurance agent and have him pursue the matter with Improved Risk Mutual Insurance Company.

Following his conversation with Walden, Prince then contacted his local agent, T. W. Stanley, about obtaining the insurance coverage with Improved Risk Mutual. Stanley's insurance agency was not licensed with that company and they concluded that it was not worth pursuing any further, but Walden was not so advised. At no time did Prince advise Walden of his failure to follow through with his Improved Risk Mutual suggestion. Neither did Prince give Walden a deadline in which to obtain the insurance with one of the other six affiliated Associated Factory Mutual Companies.

9) Defendant's president Prince was not aware of the fact that Associated Factory Mutual Companies was an affiliation of seven different fire insurance companies and he apparently erroneously concluded that plaintiff would not be able to meet the conditions of its contract since Walden had advised him that "We can't get Factory Mutual In-

surance because your tenant is a bad risk and because of this fire loss." Walden was aware of the other six companies in the Associated Factory Mutual Group.

10) Plaintiff's president Walden testified that his company was prepared to commence fabricating the parts and to commence installation of the automatic sprinkler system in defendant's building at any time, and could have completed the installation within a 30 day period; that there was apparently no rush to install the system since it could not operate until the Town of Loris completed its new water tank. He was endeavoring to obtain the required insurance coverage in one of the other affiliated Associated Factory Mutual Companies when his office received a long distance telephone call from Mr. Prince late in the afternoon on Friday, November 22, 1963, advising that defendant was rescinding its contract with plaintiff and was entering into a contract with another sprinkler company. This was the first notice to plaintiff that defendant proposed to take such action.

11) Mr. Prince testified that a representative of Moore Pipe and Sprinkler Company came to Loris to see him during the first or second week of November in reference to installing the sprinkler system in defendant's building and made a proposal to do the work for a total price of $37,000.00, which was $3,000.00 less than its contract with plaintiff. During this period of time and prior to defendant's attempted cancellation of its contract with plaintiff on November 22, 1963, Mr. Prince had been in conversation with the district representatives of the Blackstone Mutual Insurance Company (a member of the Associated Factory Mutual Group) located in Charlotte, North Carolina. On November 21, 1963 the district representative of Blackstone Mutual wrote Mr. Prince confirming their prior conversation regarding proposed insurance coverage and advising that the company, through the Associated Factory Mutuals, could provide the desired insurance.

His letter further advised *"this coverage could be effected upon your signing a contract with a sprinkler company to install sprinklers throughout the building according to plans approved by the Factory Mutual's engineering division"*. (Emphasis added). Defendant's exhibit "C". This proposal contained no requirement or condition that the sprinkler system be installed by Moore Pipe and Sprinkler Company. The next day, November 22nd, defendant received a telegram from the Providence, Rhode Island office of Blackstone Mutual advising that effective noon on that date it had bound $1,000,000.00 property damage coverage on the real and personal property of defendant's plant. This telegram was confirmed by letter to Mr. Prince from F. A. Lewis dated November 26, 1963, the latter being the authorized Underwriter of Blackstone Mutual in its Providence, Rhode Island office.

12) On November 22, 1963 after defendant had learned that Blackstone Mutual (a company meeting the requirements of the special condition of plaintiff's and defendant's contract) had bound the desired insurance coverage over its property, after defendant had received a definite proposal from Moore Pipe and Sprinkler Company of Myrtle Beach, South Carolina to install the automatic sprinkler system in defendant's building for $37,000.00, and without any prior notice or warning to plaintiff, he telephoned plaintiff's office in Charlotte in an attempt to speak to Mr. Walden. Mr. Walden was out of town at that time and Mr. Prince advised the lady answering the telephone, whom he could not identify at the time of the trial, (but presumed she was Walden's secretary) that his company was canceling its contract with plaintiff, and was contracting for the installation of the sprinkler system with another company which had succeeded in getting insurance coverage with one of the Associated Factory Mutual Group. He expressed his regrets "that things had turned out like they were; we would

have liked to have done business with General". At no time did Mr. Prince or any of the other officers or people in authority with defendant talk directly with Mr. Walden or any other officials of plaintiff in reference to its proposed rescission of their contract. Neither was any written communication ever forwarded to plaintiff to this effect.

13) On November 25, 1963, only three days after his telephone conversation with a lady in plaintiff's office and without making any further effort to contact plaintiff's officials to determine what progress, if any, had been made in obtaining insurance in one of the other affiliated members of the Associated Factory Mutual Group, Mr. Prince wrote Moore Pipe and Sprinkler Company accepting its proposal to install the sprinkler system in defendant's building. At this time Mr. Prince was well advised of the trouble, cost and expense plaintiff had incurred to that date in reliance upon its contract with defendant. At no time did plaintiff authorize rescission or cancellation of its contract with defendant.

14) The Town of Loris had contracted for the installation of a new 300,000 gallon city water tank which was required to be completed before the automatic sprinkler system in defendant's building would have sufficient water pressure to be operative. This water tank was not completed until some time in early 1964 and the Moore Pipe and Sprinkler Company did not complete its installation of defendant's sprinkler system until some time during January 1964 at the earliest. Therefore, time was not of the essence in the performance of plaintiff's contract with defendant at the time defendant attempted to cancel or rescind the same on November 22, 1963.

15) Walden nor anyone else on behalf of plaintiff contacted Prince after his telephone call to plaintiff's office on November 22nd to protest defendant's attempt to rescind the contract, or to request additional time to obtain the required insurance.

16) Plaintiff incurred $4,234.41 in costs and expenses in connection with its bid and its work pursuant to its contract with defendant. Such out-of-pocket expenses included travel, engineering expenses for drafting preliminary and final plans, payroll taxes, group hospital and life insurance, and telephone calls. Plaintiff also lost $4,000.00 (10% of contract price) in an anticipated profits which it expected to realize if it had performed fully its contract and had been paid therefor.[2]

## CONCLUSIONS OF LAW

Based upon diversity of citizenship and the amount in controversy, the court has jurisdiction of the parties and the subject matter of the action. 28 U.S. C.A. Sections 1332, 1333.

The laws of South Carolina are applicable since the contract was negotiated, executed, and was to be performed in this State.

The right to rescind a contract is based upon equitable principles, and where one party to a contract that fixes no time for its performance by the other seeks to rescind it because of the other's delay in performance, equitable considerations determine whether the contract may be rescinded and good faith on the part of the rescinding party is quite important. Davis v. Cordell, 237 S.C. 88, 115 S.E.2d 649 (1960). In enunciating the rights of one party to rescind its contract with another where no time limit is provided for performance, the South Carolina Supreme Court in *Davis* stated the principle that where no such time limit is provided in the contract time is not of the essence of

---

2. See plaintiff's exhibit 3 for itemization of plaintiff's costs and expenses from April to November 22, 1963. In connection therewith Walden testified that if contract had been completed his company would have expected to make 30% gross profit—20% overhead and 10% net profit totaling $12,000. On further questioning by the court, when asked what damages his company suffered over and above the $4,234.41 in itemized expenses and $4,000 in net profit, he answered "no other damages". (Page 45 of transcript filed June 15, 1967).

the contract and it must be performed within a reasonable time, and that before cancelling such a contract for non-performance express, unequivocal and reasonable notice must be given to the other party. At page 655 the Court stated:

"Respondent was bound by her contract to allow appellant a reasonable time for payment of the purchase price. The just and equitable principle before mentioned required that, before termination of his rights under the contract by the extreme remedy of rescission, appellant be given express, unequivocal and reasonable notice that unless within a specified time he should pay the purchase price in full or pay a definite part of it and make satisfactory arrangement for the time of payment of the balance, his rights would be so terminated."

The general rule as to the rescission of a contract for failure to perform within a time stipulated is well stated in 17A C.J.S. Contracts § 422(1), at page 520, as follows:

"*Delay in performing contract.* Where time is of the essence of the contract, failure to perform within the time stipulated is ground for rescission. If time is not of the essence, mere delay in performance is not considered a material breach justifying rescission. Mere delay in the execution of a contract, the terms of which will be satisfied by performance within a reasonable time, does not in itself entitle the other party to rescind, but, to have this effect, the implication arising from non-performance of the contract must be inconsistent with its being still in force. Where it is intended that performance shall be within a reasonable time, one party may not suddenly and in the absence of reasonable notice, terminate the contract while the other is endeavoring in good faith to perform it."

See also Smith v. Spratt Machine Co., 46 S.C. 511, 24 S.E. 376 (1894); Childs v. City of Columbia, 87 S.C. 566, 70 S.E. 296, 34 L.R.A., N.S., 542 (1910).

 Applying the foregoing authorities to the factual circumstances in this case the court can only conclude that defendant was not justified in rescinding its contract with plaintiff because of the latter's non-performance of the installation of the sprinkler system, or in its failure to obtain the desired insurance coverage with one of the Associated Factory Mutual Group as required by the special condition of the contract. The contract was entered into in the middle of September 1963 and thereafter on September 23, 1963 plaintiff obtained the approval of the Engineering Department of Associated Factory Mutual Group of its drawings and plans for the installation of the sprinkler system. There is nothing in the record to counter the testimony of plaintiff's president that his company was ready, willing and able to proceed with the installation of the sprinkler system, and that it could be completely accomplished within the thirty-day period. The contract contained no time limit for plaintiff's installing of the sprinkler system and it therefore had a reasonable time to perform and such reasonable time had not expired as of November 25, 1963 (the date of defendant's attempted rescission of the contract), under the circumstances as they then existed. Defendant had made no request or demand for performance by plaintiff subsequent to the date of the contract; neither could the sprinkler system, if installed, have been operative until the Town of Loris had completed its construction of a new elevated 300,000 gallon water storage tank, which was not in fact completed until the early part of 1964. As further evidence that time was not of the essence in the performance of this portion of the contract, Moore Pipe and Sprinkler Company which subsequently installed the sprinkler system for defendant did not complete its work until January 1964. Thus, there was no urgency in completing the installation of the sprinkler system as of November 1963.

The record contains no indication that plaintiff in any manner ever suggested or advised defendant that it was unwilling or unable to install the sprinkler system as per its contract.

In applying equitable principles to this case neither can the court agree with defendant's contention that plaintiff breached its contract with defendant wherein it failed to comply with express condition of the contract requiring it to obtain insurance coverage over defendant's building and contents with "Associated Factory Mutual Fire Insurance Company". The Associated Factory Mutual Group consisted of seven affiliated companies and obtaining the desired insurance in any one of these companies complied with such condition. Accepting defendant's construction of this provision that the burden was upon plaintiff to acquire such insurance and acknowledging that plaintiff had failed to acquire the insurance from one of these seven affiliated companies because of its prior bad experience with defendant's tenant; nevertheless, the record confirms that plaintiff was making every reasonable effort to comply with this condition and to obtain the desired insurance either through one of the other affiliated Associated Factory Mutual Companies or some other company such as Improved Risk Mutual which would be acceptable to defendant and its tenant. Here again no deadline was imposed upon plaintiff although Walden had been advised by Prince that they needed the insurance since the builders' risk company wanted to get off of the coverage. Furthermore, the testimony on behalf of the defendant and exhibits introduced by it at trial established clearly that at the time of Prince's telephone call to plaintiff's office on November 22, 1963 in an attempt to cancel or rescind the contract, defendant had actually acquired the desired insurance coverage with Blackstone Mutual, a company that met the requirements of the special condition of the contract, it being one of the Associated Factory Mutual Group. This coverage was effective upon the condition that defendant sign a "contract with a sprinkler company to install sprinklers throughout the building according to plans approved by the Factory Mutual Engineering Division". This condition had been fully met so that the insurance was effective as of November 22, 1963 as per Blackstone Mutual's telegram to Prince (defendant's exhibit "A"). Plaintiff's plans had been approved by the Factory Mutual Engineering Division and defendant had signed the contract with plaintiff for the installation of sprinklers throughout the building, as required by Blackstone's condition. There was no requirement or condition on the part of Blackstone that Moore Pipe and Sprinkler Company install defendant's sprinkler system, even though the latter did assist defendant in arranging for this insurance, of which plaintiff was unaware and in which it played no part. Thus the conclusion is unescapable that defendant had no valid, reasonable or equitable basis to cancel its contract with plaintiff based upon the latter's failure to secure the desired insurance.[3]

The three day "notice" which it purported to give plaintiff by a telephone conversation with an unidentified lady in its office was indeed not sufficient to terminate plaintiff's rights under the contract by the extreme remedy of rescission, when the law required that express, unequivocal and reasonable notice be given to plaintiff that unless within a specified time it complied fully with its contract with defendant the contract would be rescinded.

The law is also well settled in this state that:

"Breach of a contract, to justify its rescission, must be so substantial and fundamental as to defeat the purpose of the contract. * * * Here the contract specified no precise date

---

**3.** It is noted that when the defendant attempted to cancel its contract with plaintiff it already had the desired insurance and it had a firm proposal from Moore to install the sprinkler system for $3,000 less than its contract price with plaintiff.

upon which appellant was required to pay the balance of the purchase price; by presumption of law, he was required to do so within a reasonable time. In such a case mere delay in performance will not give rise to the right of rescission unless it be such as to warrant the conclusion that the party delaying does not intend to perform". Davis v. Cordell, supra.

Elliott v. Schneider, 246 S.C. 186, 143 S.E.2d 374 (1965). See also Smith v. First Provident Corp., 245 S.C. 509, 141 S.E.2d 646 (1965) wherein the court reiterated the foregoing rule and stated further:

" 'The right to rescind or terminate a contract on the ground of failure of performance by the opposite party belongs only to the party who is free from substantial default itself, and a party who has subsequently broken the contract cannot rescind it on the ground that the other party subsequently refused or failed to perform.' "

■ As before stated, at the time defendant attempted to rescind the contract plaintiff had not failed in any substantial or fundamental way to endeavor reasonably to undertake its obligations under the contract, and was guilty of no conduct which warranted defendant in concluding that it did not intend to proceed with and fully perform its obligations thereunder.

The Court concludes that defendant had no justifiable basis to rescind the contract. Therefore, its unwarranted termination of same and its entering into a new contract with another sprinkler contractor constituted a wrongful and unwarranted breach on its part which entitles plaintiff to recover damages suffered as a result thereof.

■ The general rule as to the measure of damages for wrongful breach of a contract, consistently followed in South Carolina, was declared long ago by the United States Supreme Court in United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 83, 28 L.Ed. 168 (1884), as follows:

"If the breach consists in preventing the performance of the contract, without default of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely,— First, what he has already expended towards performance (less the value of materials on hand;) secondly, the profits that he would realize by performing the whole contract."

See also Restatement, Contracts, §§ 331, 333 (1932); South Carolina Fin. Corp. of Anderson v. West Side Fin. Co., 236 S.C. 109, 113 S.E.2d 329 (1960); National Tire & Rubber Co. v. Hoover, 128 S.C. 344, 122 S.E. 858 (1921).

■ Under such principles plaintiff is entitled to recover from defendant its expenditures reasonably made in the performance of its contract with defendant, or in its necessary preparation therefor, as well as such profits as it has lost or has been prevented from making, as the natural consequence of defendant's wrongful breach of contract.

■ The evidence substantiates that plaintiff had expended the sum of $4,234.41 in the necessary preparation for and the performance of its contract up to and including November 22, 1963. It also lost $4,000 in net profits it would have realized if it had been permitted to perform fully. The court is mindful of the principle that loss of profits must be established with reasonable certainty and recovery cannot be had for profits that are conjectural or speculative. Plaintiff's president testified that his company customarily made a net profit of ten percent of the total contract price in this type of contract, and that it expected to net a profit of $4,000 if it had been permitted to complete the contract. This testimony was uncontradicted or unimpeached, and the evidence established such element of damage with reasonable certainty.

In South Carolina Fin. Corp. of Anderson v. West Side Fin. Co., supra, 113 S.E.

2d pages 335–336, the South Carolina Supreme Court stated:

"The measure of damages for breach of contract is the loss actually suffered by the contractee as the result of the breach. * * * And profits that have been prevented or lost as the natural consequence of a breach of contract are recoverable as an item of damages in an action for such breach. * * * To warrant such recovery, loss of profits must be established with reasonable certainty, for recovery cannot be had for profits that are conjectural or speculative. 'But it must be borne in mind that since profits are prospective they must, to some extent, be uncertain and problematical, and so, on that account or on account of the difficulties in the way of proof, a person complaining of breach of contract cannot be deprived of all remedy, and uncertainty merely as to the amount of profits that would have been made does not prevent a recovery. The law does not require absolute certainty of data upon which lost profits are to be estimated, but all that is required is such reasonable certainty that damages may not be based wholly upon speculation and conjecture, and it is sufficient if there is a certain standard or fixed method by which profits sought to be recovered may be estimated and determined with a fair degree of accuracy."

Accord Restatement, Contracts § 331, (1932); Charles v. Texas Co., 199 S.C. 156, 18 S.E.2d 719, at page 729, (1942); Gaines W. Harrison & Sons, Inc. v. J. I. Case Co., 180 F.Supp. 243 (E.D.S.C.1960) at page 248; McManus v. Midland Valley Lumber Co., 348 F.2d 898 (4th Cir. 1965).

Plaintiff is entitled to recover from defendant the sum of $8,234.41. It is, therefore,

Ordered that plaintiff have judgment against defendant for the sum of Eight Thousand, Two Hundred Thirty-four and 41/100 ($8,234.41) Dollars, together with the costs of this action. Let judgment be entered accordingly.