29 F.3d 154
 39 Cont.Cas.Fed. (CCH) P 76,684
 UNITED STATES of America, for and on behalf of TAYLOR & POLK
CONSTRUCTION, INCORPORATED, Plaintiff-Appellant,
v.
MILL VALLEY CONSTRUCTION, INCORPORATED, as Principal;
Hartford Fire Insurance Company, as Surety,
Defendants-Appellees.
UNITED STATES of America, for and on behalf of TAYLOR & POLK
CONSTRUCTION, INCORPORATED, Plaintiff-Appellee,
v.
MILL VALLEY CONSTRUCTION, INCORPORATED, as Principal;
Hartford Fire Insurance Company, as Surety,
Defendants-Appellants.
 Nos. 92-2096, 92-2127.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 3, 1993.
Decided July 12, 1994.
 
 ARGUED: Claron A. Robertson, III, Robertson & Sinkler, Charleston, SC, for appellant. Leonard Rose, Rose, Brouillette & Shapiro, P.C., Kansas City, MO, for appellees. ON BRIEF: Therese Trouche Smythe, Robertson & Sinkler, Charleston, SC, for appellant. Michael J. Plambeck, Rose, Brouillette & Shapiro, P.C., Kansas City, MO, for appellees.
 Before WIDENER and HAMILTON, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge WIDENER wrote the opinion, in which Judge HAMILTON and Judge MICHAEL joined.
 OPINION
 WIDENER, Circuit Judge.
 
 
 1
 Taylor and Polk Construction, Inc. (T & P) brought a breach of contract action pursuant to the Miller Act, 40 U.S.C. Secs. 270a & 270b, against Mill Valley Construction, Inc. (Mill Valley) for payments due on labor and materials it supplied during a construction project at Charleston Air Force Base in South Carolina. The district court set aside a $443,088.00 jury verdict for T & P because it found that damages had not been proven with the requisite certainty under state law. Because we are of the opinion that the method of proving damages was adequate and the damage instruction given was, under the facts of this case, at least as favorable as a proper instruction, we reverse for entry of judgment on the verdict. We affirm the denial of the defendants' motion for a new trial.I. Facts
 
 
 2
 On or about July 12, 1988 Mill Valley contracted with the United States Department of the Air Force (Government) to be the general contractor for the renovation of family housing units on Charleston Air Force Base in South Carolina. As required by the Miller Act, 40 U.S.C. Sec. 270a(a)(2), Mill Valley secured a payment bond for the benefit of those supplying materials and labor.[1] On September 27, 1988 Mill Valley subcontracted with T & P to do a large portion of the work. The parties agreed to a contract under which T & P would be paid $1,739,276 for performance of the work, subject to additions and modifications by Change Order, on approximately 186 housing units of various types as shown on the "SCHEDULE OF UNIT TYPES, COSTS, AND ESTIMATED UNITS" (Schedule of Costs).[2] The Schedule of Costs listed the total cost of each type of housing unit. This total cost had been calculated according to a handwritten sheet entitled "Schedule of Values" which broke down each type of housing unit by the estimated costs for the particular type of work to be performed (patios, roofing, painting, etc.).[3]
 
 
 3
 Under the contract monthly progress payments were to be made based on valuation of work done.[4] Although the contract indicates that valuation would be determined by percentage of each total unit completed, both parties testified that T & P actually submitted payment applications (bills) listing the estimated percentage of work completed on each unit by type of work performed. The Government's inspector approved each submission before payment. Although the contract generally provided that Mill Valley would pay T & P within 10 working days from payment by the Government, an explicit provision also stated that T & P would receive payment "on demand" regardless of payment by the Government.[5]
 
 
 4
 From its inception in October 1988, the project was plagued by work change orders, construction delays, and general disagreement over the type and quality of work to be performed. Mill Valley ultimately requested the removal of the Government project inspector in August 1989[6] and terminated T & P November 16, 1989. However, delay and inspection problems continued and the project was not completed until December 1990, a year after the scheduled completion with an increase in contract price for Mill Valley of $367,000.00.
 
 
 5
 On May 17, 1990, T & P filed this action in district court against Mill Valley and its surety, Hartford Fire Insurance Company, seeking payment under the Miller Act, 40 U.S.C. Secs. 270a and 270b, for materials and labor it had provided in performance of the contract and for breach of contract. T & P alleged that Mill Valley breached the contract when it wrongfully terminated T & P for nonperformance which Mill Valley had proximately caused by failing to pay all amounts due to T & P in a timely manner, refusing to accept work tendered by T & P in accordance with its subcontract, directing T & P to perform work in excess of its subcontract obligations and then refusing to compensate it, and unilaterally modifying the scope of work required of T & P pursuant to the subcontract, thus impairing T & P's ability to perform. T & P alleged that it suffered approximately $700,000, as a direct consequence of the wrongful termination and breach. Trial testimony established the following.
 
 
 6
 T & P began work on or about October 6, 1988 and submitted its first payment application for renovations on the first few houses at the end of the month. There was a change order even for the first few houses. Mill Valley did not make payment until December 7, 1988, but that lateness was not accounted for much of the time. Upon inspection of the units, the Government decided that additional electrical pole work would need to be done on these and all subsequent units.[7] Although both parties agreed that such work was not contemplated in the original contract, Mill Valley directed T & P to proceed, said it would file a change order with the Government contracting officer, and assured T & P that it would be paid for the additional work. The parties agree that at several later stages of construction Mill Valley asked T & P to perform additional work which was not specified in the original contract. A large additional expense, for example, was the wiring and hookup of approximately 160 overhead electrical service poles mentioned above. T & P was also asked to redo painting and switch from latex to oil-based paint, relocate the air conditioning units, skim-coat sheetrock, replace kitchen light fixtures with more expensive fluorescent light fixtures, perform extra brick and demolition work, install flooring and pipe insulation, and change plastic wall boxes to metal. In performance of this work T & P incurred additional costs for material, labor, and overhead.
 
 
 7
 Although the contract conditioned remittance for work not originally contemplated in the plans and specs to "additions and modifications by Change Order," Mill Valley insisted T & P perform such work immediately to keep the project on schedule, assured T & P that it would be paid, and said that the change orders would be forthcoming. Although change orders were not approved for many or all of the additional work until Nov. 9, 1989, just several days before T & P's termination,[8] or even later, Mill Valley clearly agreed with many of the additional bills as it certified T & P's claims to the Government as money due on work performed in good faith. More importantly, trial testimony established that during this time Mill Valley knew that the Government might not approve the additional work, yet insisted T & P continue, promising that it would be paid. Mill Valley did not inform T & P of the Government's hesitation. Mill Valley repeatedly rejected the bills submitted for additional work, arguing that the Government was contesting the pricing. T & P had testimony that it was in July 1989, 10 months into the job, while participating in negotiations with Mill Valley and the Government for payment on a portion of the additional work, that it first discovered that the Government had not and would not approve payment to Mill Valley for certain additional work, and that Mill Valley did not plan to make payment to T & P.
 
 
 8
 Testimony also indicated that after the first payment in full, retainage, which was not authorized by the contract, was withheld from all payments on the original contract work over the 14-month period. Mill Valley admitted that sums were retained, the largest amount being $42,000. Mill Valley also admitted at trial that it had cut T & P's progress applications on original contract work, one by as much as $60,000.
 
 
 9
 By mid-1989 T & P was experiencing financial difficulties which made it difficult to keep materials on the job. Mill Valley advanced T & P at least one payroll to keep the project moving. In June of 1989 Mill Valley decreased the scope of T & P's contract by taking back various sheetrock, interior painting and concrete work, thus reducing the contract price by about $330,000.
 
 
 10
 Nonetheless, in July or August, T & P's $250,000 credit line ran out and by autumn of 1989, T & P was in financial trouble. At trial T & P contended that its financial predicament was caused by Mill Valley's repeatedly reducing T & P's monthly payment applications, withholding of retainage not specified in the contract, and failure to pay for any additional work T & P had performed upon request. Mill Valley contended the financial trouble was due to T & P's undercapitalization, poor management, and inexperience.
 
 
 11
 The Government approved and signed modifications 6, 7, and 8 on November 9, 1989 for some $134,483. Although those payments would be largely for electrical and mechanical work, and thus apparently attributable to work performed by T & P, Mill Valley neither paid T & P any money nor notified it of the modification as required by the contract.[9] Instead, on November 13, 1989, Mill Valley sent T & P a letter stating that it intended to terminate the subcontract unless T & P could provide evidence within three days that all materialmen's claims against T & P had been paid and that T & P had funds sufficient to meet payrolls and ongoing expenses. Mill Valley sent a letter to T & P three days later, on November 16, 1989, terminating the subcontract at issue here. T & P had completed 90 housing units and had performed substantial work on approximately 18 others.
 
 
 12
 Thereafter Mill Valley paid some $155,658 on T & P's behalf to suppliers demanding payment. Although Mill Valley continued to inform T & P of other bills due suppliers, it did not inform T & P of many of the change orders ultimately signed by the Government for work performed by T & P. The balance of the 39 modifications were pending for months or even years and some were ultimately negotiated long after T & P was off the job. Mill Valley admits that some of the modifications were for work T & P had done.[10] Although it is impossible for us to discern precisely from the record before us, in sum it appears that T & P was not paid for additional work it performed for which change orders were issued and money received by Mill Valley, a substantial portion of which the Government approved before T & P was terminated. As of the date of trial, T & P had only received $5,118 for the paint claim.[11]
 
 
 13
 On November 18, 1991 following a four-day trial, the jury returned a $443,088.00 verdict for T & P on its breach of contract claim.[12] Mill Valley moved for judgment notwithstanding the verdict under Fed.R.Civ.P. 50 or a new trial under Fed.R.Civ.P. 59 arguing that a prima facie case of breach of contract had not been proven and that damages had not been connected to any particular breach of the contract. On August 14, 1992, the district court granted a judgment notwithstanding the verdict because it concluded that neither actual loss nor lost profits had been proven with the certainty required under South Carolina law. The court took the position that T & P had not provided evidence connecting its loss to any specific breach of the subcontract or to the specific amounts spent on additional work. This appeal followed.II.
 
 
 14
 On appeal, T & P alleges error in the district court's jury instructions regarding the theory of damages in this breach of contract suit and the court's granting of judgment notwithstanding the verdict because damages had not been proven under South Carolina law. We first address the appropriate measure of damages in this Miller Act case for breach of contract.
 
 
 15
 The record indicates a certain amount of confusion and frustration as to the proper measure of damages in this case. Although the complaint and early trial testimony indicate that T & P sought damages for amounts due under the original contract and additional work performed, by the end of trial it was clear that the dispute centered around amounts due for additional work completed during T & P's 14 months on the job for which it had not been paid. Because it believed it was impossible to distinguish between amounts spent for original contract work and those spent for the additional work from T & P's testimonial and documentary evidence, the district court noted its concern as to the theory of damages and the adequacy of T & P's proof of damages during the trial. T & P insisted throughout the case, in a proposed jury instruction on damages, during a midtrial conference on damages, during Mill Valley's motion for directed verdict and charge conference, and in closing argument, that a proper consideration in the measure of damages was the difference between what it had spent in performance and what it had been paid. T & P explained that this amount necessarily considered the amount spent on the additional work (i.e., change orders and addenda). It arrived at the total amount figure by taking the total of the disbursements made during the period, detailed as to the purpose of the expenses, subtracting those spent for other projects, and grouping the remaining checks according to type of work. It also asked for 10% profit and interest as specified in the contract. T & P's calculations were as follows:
 
 
 16
 Administration & Overhead $237,334.55
Labor 451,104.96
Concrete 22,193.38
Carpentry 126,269.80
Insulation 15,768.20
Electrical 117,272.56
HVAC 16,109.23
Painting 35,803.88
Sheetrock 68,731.57
Miscellaneous 15,838.29
Fences 899.79
 -----------------------------
Total Expenses $1,107,325.90
Less amounts other contracts 37,232.96
 13,935.91
Less amounts paid on original contract 809,451.56
 work
 -----------------------------
-------------------------------------------------------------------------------
Total Out-of-Pocket $246,742.00[13]
Plus profit of 10% of contract price 158,116.00
 -----------------------------
 Subtotal $404,858.00
Plus interest at contract rate 145,648.00
 Subtotal $550,506.00
Less amounts now paid on claims 46,368.00
 -----------------------------
Total Damages Due $504,138.00
 
 
 17
 T & P characterized this as a total cost method. Although on appeal Mill Valley contends that the measure of damages is controlled by state law, during trial it sporadically requested the total cost damage instruction under federal caselaw.
 
 
 18
 The district court had expressed doubt on this total cost approach during a mid-trial conference, stating that it was not the law in South Carolina or "anywhere." It also stated that such a damage theory was not good law because it eliminated the requirement that a plaintiff prove the damages were proximately caused by the breach.[14] T & P then suggested recovery in quantum meruit.[15] Mill Valley objected to a quantum meruit theory, stating that it had no notice of it and that such a theory was inconsistent with a proceeding on a Miller Act bond. Although the court noted that there was authority for recovery in quantum meruit, it stated that T & P had proceeded on a breach of contract theory of damages rather than a quantum meruit recovery under the Miller Act. The trial proceeded and the court ultimately rejected T & P's total cost approach during the charge conference directly preceding closing arguments. The court gave a general damage charge stating
 
 
 19
 In an action as this for breach of contract, a party may recover for all damages it suffered as a proximate result of the breach. And by proximate result, we give a but for definition. But for the breach, the damages would not have been incurred by the plaintiff. If that is the case, then the damages can be said to have been proximately caused by the breach.
 
 
 20
 Something is proximately caused by a breach of contract if you can say that but for the breach they would not have taken place. To say it another way, the measure of damages for breach of contract is the loss actually suffered by the person injured by the breach, as the result of the breach.
 
 
 21
 It also instructed the jury on the right to lost profits and interest as specified in the contract. T & P took exception to the damage instruction arguing that it was entitled to recover the cost of the work plus lost profits. The district court considered that the measure of damages it applied was under state law.
 
 
 22
 In considering the instructions offered and given to the jury we must, of course, consider the setting. Pursuant to correct instructions by the district court on the elements which were required to be proved, and the defenses available, the jury found that Mill Valley breached its contract. There was abundant evidence to support this finding. For example, Mill Valley retained a part of the money due to T & P without authority under the contract. Mill Valley did not pay T & P amounts due for work T & P had accomplished at the direction of Mill Valley. Only three days before Mill Valley terminated the contract, it had received approval from the Government for some $130,000 worth of changes, at least a substantial part of which were on T & P's account, and never even bothered to advise T & P of such approval. Mill Valley did not advise T & P of any other approvals by the Government of the balance of the 39 changes under the contract. The district court came to the same conclusion as do we as to the sufficiency of evidence as to breach of contract as it overruled Mill Valley's motion for a directed verdict. Even now, Mill Valley does not allege that the materials or labor involved in the T & P claim were not used in the execution of the contract and changes. We note that its brief lists eleven possible defenses to the suit, all of which were rejected by the jury, but it does not include any claim that the labor and materials were used elsewhere or not used at all.
 
 
 23
 In that setting, T & P offered the following instruction to the jury which the district court refused:
 
 
 24
 I charge you that the measure of damage to a subcontractor as a result of the contractor's breach of the subcontract is the amount already spent in performance of the contract plus lost profit and overhead on the entire contract amount.
 
 
 25
 This language was substantially taken from General Sprinkler Corp. v. Loris Indus. Develop. Inc., 271 F.Supp. 551 (D.S.C.1967), but more importantly, the General Sprinkler quotation was a direct quotation from United States v. Behan, 110 U.S. 338, 344, 4 S.Ct. 81, 83, 28 L.Ed. 168 (1884), which is
 
 
 26
 [i]f the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely: first, what he has already expended towards performance (less the value of materials on hand); secondly, the profits that he would realize by performing the whole contract.
 
 
 27
 The jury found that Mill Valley prevented the performance of the contract by T & P, that such was without the fault of T & P and that T & P was willing to perform. These findings are fully factually supported as we have pointed out. Thus, the instruction offered by T & P as to measure of damage, which was not substantially different from the quoted language of the court in Behan, should have been given.
 
 
 28
 The question remains whether that error requires reversal or merely a new trial on the issue of damages. Before addressing that question, however, we note that the district court declined to apply the instruction from Behan because it stated that instruction was not the law of South Carolina or "anywhere." That the instruction offered is good federal law is not open to question because of the Behan case. Not only is it federal law, it is the general law. See 25 C.J.S. Damages Sec. 78 (1966); 3 Dan B. Dobbs, Dobbs Law of Remedies, Sec. 12.20(1) at 455 (1993); 17 A.L.R.2d Breach of Contract-Expenditures Sec. 9 at 1329 (1951); see also 13 Am.Jur.2d Wrongful termination of contract by owner Sec. 78 at 78 (1964); 11 Samuel Williston, Williston on Contracts Sec. 1339 at 204-05 (1968).
 
 
 29
 We have examined the authorities provided to us and find no authority to the contrary in South Carolina. We note that General Sprinkler adopts Behan as the law in South Carolina. We think that the rule of damages in Behan being the general law as well as the federal law, is the law of South Carolina, and that the courts of that State would so apply it. Indeed, in SC Fed. Sav. Bank v. Thornton-Crosby, 303 S.C. 74, 399 S.E.2d 8 (App.1990), a case in which the builder had defaulted on a construction contract, damages to the owner were stated to be "(1) out of pocket costs actually incurred as a result of the contract; and (2) the gain above cost that would have been realized had the contract been performed." 399 S.E.2d at 11. So we see that on only slightly different facts the rule of damages in South Carolina is not significantly different from that set forth in the Behan case. We do not have to decide whether or not the federal or state law of damages applies in this Miller Act case, they are the same. See United States v. Algernon Blair, Inc., 479 F.2d 638, 640, n. 2 (4th Cir.1973).
 
 
 30
 Having decided that the instruction proffered by the plaintiff was correct and should have been given, we must now ascertain whether or not reversal is required or merely a new trial. The instruction given to the jury in the setting here was no less favorable to the plaintiff than the Behan instruction. Here the court instructed the jury that the measure of damage was "the loss actually suffered by the persons injured by the breach." The claim as shown by the computation above calculated according to Behan, (except the inclusion of interest) showed the actual loss to T & P. Indeed, the instruction given to the jury permitted the jury to include interest, an item not included in the damage formula in Behan. So the plaintiff has suffered no injury by giving the instruction that the district court gave, rather than the more correct one from the Behan case which should have been given. Thus, unless the district court was correct in setting aside the verdict because item by item distinction was not made between the original contract items and changed items, its judgment must be reversed. It so happens that same defense has been rejected both in the courts of South Carolina and the United States. Lazer Const. Co. Inc. v. Long, 296 S.C. 127, 370 S.E.2d 900 (App.1988); United States v. Behan, supra, 110 U.S. at p. 344, 4 S.Ct. at 83.
 
 
 31
 In Lazer, the suit was brought against an owner under a construction contract for the building of a residence and, like the case at hand, concerned changes in the contract. Also, like the case at hand, the owner did not allege any of the changes were unauthorized. 370 S.E.2d at 902. His defense was that "there was no competent evidence showing which costs were attributable to approved changes and which were merely cost overruns." 370 S.E.2d at 903. So the facts of that case and the facts of this case are indistinguishable. The jury had delivered its verdict to include the changes. Judgment was entered on the verdict and the court of appeals affirmed. It stated "because Long [the owner] does not assert any of the changes were unapproved, the jury could have found all costs claimed by Lazer resulted from approved changes." 370 S.E.2d at 903. So the law of South Carolina is contrary to the decision of the district court in setting aside the verdict in this case. While the precise argument of the Government is not set forth in detail, in Behan it is apparent that a claim was made that the expenses of the plaintiff had not been reasonable. The plaintiff in that case was making improvements in the harbor of New Orleans under a contract with the U.S. Army when the Army unjustifiably ordered Behan to cease work on the contract without any fault of Behan and the question, as here, was the measure of damage. In finding the expenditures were reasonable, the court reasoned that
 
 
 32
 [u]nless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred in the fair endeavor to perform the contract which he assumed. If they were foolishly or unreasonably incurred, the government should have proven this fact. It will not be presumed. Behan, at p. 344, 4 S.Ct. at p. 83.
 
 
 33
 Thus, we see that the method of proof of T & P has the approval of both the state and federal courts in almost the exact situation present here. For that reason, the judgment of the district court must be reversed.
 
 
 34
 Mill Valley has filed a cross-appeal arguing essentially that its motion for a new trial rather than a reversal should be granted if the judgment of the district court is vacated. As we have set forth in this opinion, the verdict of the jury that Mill Valley had breached its contract with T & P was amply supported by the evidence. While the jury did not award T & P all of its claimed damages, it was not required so to do, and we think the evidence of damages which was introduced is sufficient to support the verdict. The district court agreed with this proposition.
 
 
 35
 In No. 92-2096, the appeal of T & P, the judgment of the district court is reversed, and the case is remanded for reinstatement of the jury verdict with judgment to be entered thereupon.
 
 
 36
 In No. 92-2127, the cross-appeal of Mill Valley, the judgment of the district court is affirmed in that it denies a new trial to Mill Valley.
 
 
 37
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 The Miller Act requires a contractor on a federal construction project to furnish:
 (2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person.
 40 U.S.C. Sec. 270a(a)(2). Hartford Fire Insurance Company was the surety on this bond and is a named defendant in the suit. We will refer to defendants collectively as Mill Valley.
 
 
 [2]
 The contract work was described as the "Labor, Materials, Tools and Equipment to complete following work per plans and specs:" 1) additions, complete (excluding flooring, windows, doors); 2) electrical, including telephone lines restored to serviceability; 3) HVAC (heating, ventilation, air conditioning); 4) underground services; 5) patios and fences; 6) gypsum wall board (sheet rock); 7) painting; and 8) interior frame carpentry
 
 
 [3]
 Each breakdown figure included amounts for materials, labor, 10% profit and 15% overhead
 
 
 [4]
 The contract also provided that T & P would be paid for unused materials or equipment bought and safely stored at the site
 
 
 [5]
 Provisions 10.4 provide in full:
 Unless otherwise provided in the Contract Documents, if the Owner fails to issue a Certificate for Payment or the contractor does not receive payment for any cause, which is not the fault of the Subcontractor, the Contractor shall pay the Subcontractor, on demand, a progress payment computed as provided in Paragraph 10.3 or the final payment as provided in Article 6.
 
 
 [6]
 Mill Valley testified that it had experienced problems satisfying the government inspectors, felt that one had a personal vendetta against Mill Valley, and required that he be removed from the project
 
 
 [7]
 The electric pole work consisted of the addition of a junction box at the base of the pole, connectors, tape, tools to make the hook-up, equipment to get up the pole, wire, conduit, weatherhead, a number of items of material, and electrician labor
 
 
 [8]
 It appears that the government contract was modified some 39 times for an addition to the contract price of approximately $376,194
 
 
 [9]
 In fact, T & P did not find out about the November 9 modifications until several weeks before trial during a review of files it received from Mill Valley
 
 
 [10]
 Defense exhibit # 59, Mill Valley's schedule of payments from the government, is not included in the record on appeal
 
 
 [11]
 At the time of trial, Mill Valley stated that T & P would also be paid $41,250 recovered on the pole work modification. We do not know if such money was ever actually paid
 
 
 [12]
 The jury's Special Interrogatories form indicated that it had found a breach of the written contract but not of any oral contract. Because the jury had been charged that proper change orders became part of the written contract, the finding was that additional work had been performed without payment
 
 
 [13]
 We note that this amount contains an error of plus $36, as T & P indicated in its appellate brief. We also note that T & P began rounding off to whole dollars at this point in the computations
 
 
 [14]
 However, as we note, the district court did instruct the jury that damages must be proximately caused by the defendants' breach. In part "the key word in damages is proximate cause." A. 813
 
 
 [15]
 In two Miller Act cases in this circuit on facts which are factually indistinguishable from those present here, in each of which a breach of contract had been proven, we held that a quantum meruit recovery was nevertheless available and remanded each of those cases to the district courts to ascertain damages only. United States v. Algernon Blair, Inc., 479 F.2d 638 (4th Cir.1973); followed in W.F. Magann Corp. v. Diamond Mfg. Co., 775 F.2d 1202 (4th Cir.1985). Because there was a recovery under the contract in this case, however, we do not consider any error in not instructing the jury on quantum meruit recovery